A03A2100. IN THE INTEREST OF R. W., a child.
A03A2101. IN THE INTEREST OF T. J., a child.
(593 SE2d 367)

RUFFIN, Presiding Judge.

Following a hearing, the juvenile court terminated the father's parental rights to R. W. and T. J.[1] In Case No. A03A2100, the father challenges the court's termination order with respect to R. W. In Case No. A03A2101, he challenges the court's order terminating his rights as to T. J. As both cases involve the same facts and the identical issue, we have consolidated them on appeal. For reasons that follow, we affirm.

In reviewing a juvenile court's termination of parental rights, we view the evidence in the light most favorable to that court's decision, and we will affirm if the record demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[2]

Viewed in this light, the record reveals that the father had a relationship with the children's mother beginning in 1993. The mother became pregnant with R. W., who was born in January 1994. Late in the mother's pregnancy, the father was caught selling cocaine. It was the father's third drug conviction, and he was sentenced to serve 20 years. Following his conviction, but before being sent to prison, the father remained free on bond. According to the father, during this time he continued to work and provide some financial support for R. W., who was eight months old when the father was incarcerated.

In February 1995, while the father was in prison, the mother gave birth to T. J. However, the father was unaware of T. J.'s existence until after his birth. As a result of his continued incarceration, the father has only seen T. J. once. According to the father, neither R. W. nor T. J. would recognize him if they saw him.

In 1999, after the father was imprisoned, the mother voluntarily

---

[1] The juvenile court also terminated the parental rights of the children's mother, who has not appealed the order.

[2] See *In the Interest of J. M. M.*, 244 Ga. App. 171 (534 SE2d 892) (2000).

placed her two children in foster care. The children were eventually returned to the mother's care. However, in late August 2000, the mother had a third child by another man, and both she and the infant tested positive for cocaine. Accordingly, the children were taken into the custody of the Department of Family and Children Services (DFACS) in September 2000 and returned to foster care.

DFACS developed a reunification plan for the mother, but she failed to comply with the plan. In March 2001, DFACS petitioned for termination of parental rights. DFACS employees attempted to ascertain the whereabouts of the children's father, but the mother was evasive. Eventually, DFACS discovered that the father was in prison and served him notice of the termination petition.

The father appeared at the termination hearing and testified on his own behalf. Although the father was sentenced to 20 years in jail, he claims that he has a tentative parole date of February 2004. The father testified that, until his release from prison, his children could stay with a friend of his. According to the father, he has qualified for Social Security disability benefits, which he will begin receiving after his release. The father, who was 57 at the time of the hearing, testified that his eligibility for such benefits stems from his status as an insulin-dependent diabetic. The father also said that he tested positive for HIV, but that his "HIV problem" is "not in [his] bloodstream anymore."

Following the hearing, the trial court terminated the father's parental rights. The trial court based its ruling, in part, on the following factors: (1) the father's history of drug use; (2) the fact that the father has been incarcerated since R. W. was less than one year old; and (3) the father's failure to register with the putative father registry or to legitimate his children before he was served with the termination petition. In his sole enumeration of error on appeal, the father asserts that the trial court improperly terminated his parental rights based solely on his incarceration. We disagree.

In a termination of parental rights proceeding, the juvenile court employs a two-step process.[3] The court first must determine whether there is clear and convincing evidence of parental misconduct or inability, which shall be proved by demonstrating:

> 1) that the [children are] deprived; 2) that the lack of proper parental care or control is the cause of the deprivation; 3) that the [children's] deprivation is likely to continue or will not be remedied; and 4) that continued deprivation is likely

---

[3] See *In the Interest of C. B.*, 258 Ga. App. 143, 145 (1) (574 SE2d 339) (2002).

to cause serious physical, mental, or moral harm to the [children].[4]

Under the second step of the inquiry, the court must consider whether termination is in the best interests of the children.[5]

In determining whether grounds for termination exist, a juvenile court shall consider the "[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship."[6] Although imprisonment alone does not compel termination of a parent's rights, "it can support such a ruling when sufficient aggravating circumstances are present."[7] "These aggravating circumstances may include, in addition to a history of incarcerations for repeated offenses, whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive, and parental manner."[8]

Here, sufficient aggravating circumstances are present, which justify termination. Initially, we note that the father's current imprisonment is not his first brush with the law, but his third. Moreover, the length of the father's incarceration has prohibited him from establishing any bond with either of his children. If the father is released from prison in 2004, R. W. will be ten and T. J. will be nine. And both children will be virtual strangers to their father.

Finally, we note that while the father has been in prison, the children's mother has demonstrated an inability to care for the children, which resulted in their being removed from the home and placed in foster care on more than one occasion. At the termination hearing, the State presented evidence that a foster family was interested in adopting the two children, who are deserving of a stable home. Under these circumstances, there is sufficient evidence supporting the juvenile court's conclusion that termination of the father's parental rights is in the best interests of the children.[9] It follows that the juvenile court did not err in terminating the father's rights.[10]

*Judgment affirmed. Smith, C. J., and Miller, J., concur.*

---

[4] Id. See also OCGA § 15-11-94 (a), (b) (4) (A).

[5] See *In the Interest of C. B.*, supra at 146; *In the Interest of D. P.*, 244 Ga. App. 553, 554 (536 SE2d 225) (2000).

[6] OCGA § 15-11-94 (b) (4) (B) (iii) (a factor "[i]n determining whether the child is without proper parental care and control").

[7] *In the Interest of B. A. S.*, 254 Ga. App. 430, 435 (3) (563 SE2d 141) (2002).

[8] (Punctuation omitted.) *In the Interest of K. W.*, 262 Ga. App. 744, 746 (1) (b) (586 SE2d 423) (2003).

[9] See *In the Interest of B. A. S.*, supra at 435-436 (3).

[10] See id.; *In the Interest of J. R. H.*, 257 Ga. App. 218, 219-220 (570 SE2d 652) (2002); *In the Interest of S. H.*, 251 Ga. App. 555, 557-558 (1) (b) (553 SE2d 849) (2001).

DECIDED JANUARY 15, 2004.

*Hughes & Hobby, David T. Hobby,* for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Mixon & Mixon, Warren L. Mixon,* for appellee.

A03A2364, A03A2365, A03A2366, A03A2367, A03A2368.
GIGNILLIAT v. CHATHAM COUNTY BOARD OF TAX
ASSESSORS (five cases).
(593 SE2d 355)

RUFFIN, Presiding Judge.

On July 16, 1999, T. Heyward Gignilliat appealed to the Chatham County Board of Equalization regarding the 1999 tax assessments for parcels of property he owns in Chatham County. Unhappy with the Board's ruling, Gignilliat appealed to the superior court, which found in his favor as to each parcel. Gignilliat thereafter moved for attorney fees pursuant to OCGA § 48-5-311 (g) (4) (B) (ii). The trial court denied his motion, finding that this provision was not applicable because it only applies to assessments and proceedings commenced on or after January 1, 2000, and these cases commenced on or before July 16, 1999. Gignilliat appeals. For reasons that follow, we affirm.

Pursuant to OCGA § 48-5-311 (g) (4) (B) (ii),

If the final determination of value on appeal is 80 percent or less of the valuation set by the county board of equalization as to commercial property, or 85 percent or less of the valuation set by the county board of equalization as to other property, the taxpayer, in addition to the interest provided for by this paragraph, shall recover costs of litigation and reasonable attorney's fees incurred in the action. . . .

As noted by the trial court, this provision became effective on January 1, 2000, and it applies to all assessments and proceedings commenced on or after January 1, 2000.[1] Gignilliat admits that these cases involve 1999 tax valuations, but argues that he is entitled to costs and attorney fees because the Board did not decide these cases

---

[1] See Ga. L. 1999, p. 1062, § 4.